## Stuart *vs.* Kissam and others.

Although a woman be married, and have a separate estate, and a trustee, yet when the trustee puts before her eyes, clear and express notice of his doings, she same inferences must be drawn as to her reading and understanding the notice, as would arise in the case of an unmarried woman, or a man.

Although good faith must be strictly enforced against a trustee, and he may not be allowed to deal with the trust property to his own benefit, yet where the trustee had substituted a new security, by way of mortgage, in the place of a former mortgage, upon certain property, but not including the whole, which was covered by the former mortgage; and there was no gain intended to be made by the trustee; and so far as appeared, the new security would have been deemed sufficient at that time, and it was accepted by the *cestui que trust*, who was competent to judge of its value, the transaction was not deemed to be void.

Whether a different rule would apply, if it had been shown that there was a fraudulent combination between the trustee and the other parties to the transaction to cancel the first mortgage for their benefit, it is not necessary to inquire, where there is no *proof* of actual fraud; and it ought not to be gratuitously inferred.

Actions may be brought against legatees by a creditor; but he must show that no assets were delivered by the executor to the next of kin, or that the value of such assets has been recovered by some other creditor; or that they are not sufficient to satisfy his demand.

Heirs also may be made liable for the debt of their ancestor, but not unless it appears that the personal assets were not sufficient to pay the same, or that after due proceedings before the surrogate and at law, the creditor has been unable to collect such debt from the executor, or from the next of kin, or legatees. Thus a suit at law, against the prior parties, is an essential preliminary to a right to sue the heirs. The heirs are to be sued jointly in equity.

Devisees may also be liable for the debts of the devisor, but not unless it appears that the personal assets, and the real estate descended, were insufficient to discharge the debt; or that after due proceedings before the surrogate, and at law, the creditor has been unable to recover the debt.

It makes no difference, that the same persons are entitled to the whole estate real and personal. The statute makes no exception; but requires the creditor, in *all cases* to seek satisfaction from the personal property, before he resorts to the real estate in the hands of the heir.

In a suit of this kind, whether at law, or in equity, all the heirs must be joined; and the heirs and personal representatives *cannot be joined* in a suit.

A trustee of the separate estate of a married woman, having become seised, in his own right, of the greater part of the premises covered by a mortgage for $20,000, belonging to his *cestui que trust*, acknowledged satisfaction of

Stuart *v.* Kissam.

such mortgage, and caused it to be canceled of record; and soon afterwards, conveyed to his brother one-third of the mortgaged premises, and took back from him, his bond for $20,000, with a mortgage upon the part of the premises so conveyed to him, payable at the time of payment of the original bond and mortgage which he had canceled. This new mortgage the trustee substituted in lieu of the canceled mortgage, and executed a declaration of trust, declaring that he held the same in trust for the separate use of his *cestui que trust;* but the property covered by the substituted mortgage, turned out to be an inadequate security for the $20,000. On a bill filed by the *cestui que trust,* alledging that the original bond and mortgage had never been paid or satisfied, that the cancelment of that mortgage by her trustee, was without her knowledge or assent, and insisting that it was a breach of trust; a decree was made by a judge at a special term, establishing the original bond and mortgage as valid and existing securities, saving the rights of subsequent *bona fide* mortgagees; and directing a sale of the mortgaged premises, and the payment of the deficiency, if any, out of the estate of the obligor in the original bond. Upon an *appeal* from this decree, it was *held,* that the satisfaction of the *first mortgage,* which was produced in evidence, was *prima facie* proof of its discharge; and that the whole case of the complainant depended on her establishing that the second mortgage was not substituted with her assent; and that this she had failed satisfactorily to do; and that, in this view of the case, so much of the decree appealed from, as directed a sale of any but the forty-two lots, (which were the part of the original premises covered by the new or second mortgage, which was substituted for the first,) and an account of the estate of the trustee, and of the personal assets which came to the hands of any of the parties to this suit, as legatees and next of kin, and of the real estate which came to said parties as devisees—with the other parts of the decree connected with these inquiries should be *reversed,* with the costs of appeal.

IN EQUITY. This was an appeal by the defendants from a decree made by Justice Hurlburt, at a special term held in the city of New-York, 13th March, 1848. The case at special term is reported in 2d Barbour's Supreme Court Reports, 493. After the decree was made, Robert Stuart died, and that fact having been suggested to the court, and the written consent of the solicitors for the defendants being filed, it was ordered that the suit proceed in the name and in favor of Mary R. Stuart, as sole plaintiff therein. All the important facts and circumstances of the case appear in the opinion of the court.

Stuart *v.* Kissam.

*E. Sandford,* for the appellants.

*C. O'Conor,* for the respondent.

*By the Court,* MITCHELL, J.   There are two questions raised by the appellants, which are of such consequence as to make the consideration of the others comparatively unimportant, viz. : 1st. Was not the second bond and mortgage substituted for the first, with the assent of Mrs. Stuart? and 2d. Can the legatees and devisees of Dr. Kissam, the obligor in the first bond, be made personally liable for any deficiency in the mortgaged premises on a foreclosure suit, and before resort has been had to his executors ?

On the 29th of April, 1833, Mr. Cotton conveyed No. 3 of Turtle Bay Farm to Dr. Daniel W. Kissam, jr., for $24,000, and on the same day the doctor gave to Mr. Cotton his bond and a mortgage on the same premises for $20,000, payable with interest, on or before the 1st of May, 1843.

On the 3d of May, 1833, Mr. Cotton, with the assent of Mrs. Stuart, assigned the bond and mortgage to Joseph Kissam; on the same day, Joseph Kissam executed a deed poll, witnessed by Isaac A. Johnson, Esq., in which it is declared, substantially, that the assignment is for her sole use and benefit.

Dr. Kissam made his will, dated the 1st of December, 1834, and a codicil, dated 3d March, 1835, and died shortly afterwards. Letters testamentary were granted to his executors, Samuel Kissam and Timothy T. Kissam, on the 15th of May, 1835. The will gave the executors a power to sell the real estate of the testator, and after sundry legacies gave his residuary estate to his three brothers, Joseph, Samuel and Timothy T., and to his two sisters, Mrs. Conklin, and Maria Kissam. He left a personal estate amounting to more than $50,000, as appeared by the inventory filed by his executors, and the bill alledges that his real and personal estate amounted to more than $30,000 over *all* his debts and liabilities ; and that the executors had not caused a final settlement of their accounts to be made before the surrogate.   A witness for the plaintiff, (J.

J. Diossy,) testified that the doctor was reputed to be worth $80,000 or $100,000.

The bill alledges, and the answers of Joseph, Samuel, and Timothy T. Kissam, admit that Joseph and Samuel were jointly interested with the doctor in the purchase. A bill was filed by some of the creditors of Robert Stuart, the husband of Mary R. Stuart, to set aside the conveyance to Dr. Kissam, as being fraudulent as against Mr. Stuart's creditors. The doctor, in his answer to that bill, states, that the mortgage was held for the benefit of Mrs. Stuart.

In November, 1835, the farm was sold at auction under the direction of the executors, being divided into more than 100 lots; deeds were given, not by the executors, but by the five residuary devisees. The deeds were all dated 3d of December, 1835, and are to Gilbert Leggett, for four lots at $645 per lot; to him for four other lots at $645 per lot; to Shattuck & Ackland, for eight lots at $620 per lot, and the $\frac{2}{15}$ of (as is supposed) the residue of the lots, to Joseph Kissam, for $35,790; he already owning $\frac{1}{3}$ or $\frac{5}{15}$ as a joint purchaser with the doctor, and obtaining by devise from the doctor, $\frac{1}{5}$ of $\frac{1}{3}$, or another $\frac{1}{15}$.

In 1838, some of the lots sold to third parties, were bought by Joseph Kissam at $525 per lot, and in 1841, some others at $350 per lot. Mr. Bleecker, the auctioneer, supposed these lots might have brought from $500 to $600 in 1336; three-fourths remaining on mortgage.

On the 6th of January, 1836, Joseph Kissam conveyed 42 of the lots held by him, to Samuel Kissam, and Samuel, at the same time, executed to him his bond and a mortgage on the same premises, conditioned for the payment of $20,000 with interest, on or before the 1st of May, 1843. On the same day, Joseph Kissam executed an instrument of that date, reciting, that Samuel had executed a mortgage to him, on property between 45th and 46th-streets, to secure the payment of $20,000 and interest, and covenanting with Mrs. Stuart that he held it for her sole and separate use, and that he would account with, and pay over to her, all moneys that he should receive on account of the mortgage—thus far conforming to the former de-

claration of trust; but it also adds, what was not in the former, that he will assign the mortgage to such persons as she may designate in writing, and that *in case of her death*, he will account for the moneys or assign the mortgage, as she, by writing under her hand and seal, shall designate and appoint.

On the 4th of February, 1836, Mrs. Stuart, in pursuance of the provisions contained in the last declaration of trust, and by an instrument attached to or written on it, directed Joseph Kissam, in case of her death, to pay over to her husband, Robert Stuart, if he survived her, all moneys that might be due on the bond and mortgage described as " within mentioned," and at his request to assign them to him, and it states that this is executed " by virtue of the provision contained in the *within declaration of trust*."

1st. Was the mortgage given by Dr. Kissam satisfied, and a new one substituted in its place, with the assent of Mrs. Stuart? There are circumstances strongly tending to prove that this was so in fact. The old mortgage was in the possession of the Kissams at the time of the examination, and produced by them. This would not, of itself, indicate much, as Joseph Kissam was the trustee of Mrs. Stuart; but it is of great weight when it is also found that the first declaration of trust given by Mr. Kissam, was also in his *possession*, and canceled. That indicates strongly, that the trust, under which that mortgage had been held, was in some way, satisfied; and that on its satisfaction, Mrs. Stuart gave up the declaration of trust, and that the mortgage was then canceled.

The bill admits that Joseph Kissam became possessed of this declaration of trust; it says by some means; it does not pretend—except by that insinuation, which amounts to nothing— that it was by any but fair means, and with Mrs. Stuart's assent. It then, also states, that Joseph Kissam executed another declaration of trust, and caused it to be *substituted* and *delivered* to Mrs. Stuart, as *thereinafter* mentioned, in the *place* of the first declaration of trust. Thus admitting that in fact the second trust, which applied to the second mortgage only, was substituted for the first, which applied to the first mortgage only.

The most casual reading of the second declaration would show that it referred to a new mortgage, and so that the old one was no longer in force. The old one was by Daniel W. Kissam, jr. to Spencer D. Cotton, in April, 1833, on the whole farm. The new declaration of trust describes the mortgage to which it applies, as given by Samuel Kissam to Joseph Kissam ; and as of even date with the declaration, viz. 6th January, 1836, so showing certainly, that it was new, and on premises between 45th and 46th streets. Daniel W. Kissam had been her physician, Spencer Cotton her trustee. Joseph Kissam was then her trustee ; the names must have been all as familiar to her as those of her own family. How then could she doubt that she was receiving a substituted security, even if her eyes only glanced over the names in the beginning of the declaration? The statement that the mortgage was of even date with this trust, was a direct notification to her that it was a mortgage just then executed ; and as it was for $20,000, the precise sum held in trust for her before, she must have known it was in substitution of the former security : it described, too, the lands—not as a farm, (as the first mortgage did,) but as certain lands between 45th and 46th-streets. She must have known enough of the farm to know that this did not include the whole farm.

She gave up one declaration of trust, and accepted another : this must have given her knowledge of a change, which would lead her to look into the second. Even if her main object had been to have, in the second, an express power to bequeath the estate, (which she does not alledge,) that would have led her to read the new instrument, and then she could not fail to perceive the change. Though a woman be married, and have a separate estate, and a trustee, yet when the trustee puts before her eyes such clear and express notice of his doings, the same inferences must be drawn as to her reading and understanding the notice, as would be in the case of an unmarried woman, or a man. The evidence of notice to her would not be clearer and not so satisfactory, if a witness had sworn that Joseph Kissam had called on Mrs. Stuart, and told her that he had taken a mortgage from his brother Samuel on part of the farm bought by the doctor of

her, and held it in trust for her, as the only security for the $20,000 due to her—and so in place of the doctor's mortgage. Then there would have been a doubt that the witness might not have correctly recollected what took place, or that Mrs. Stuart might have misunderstood the words used. Here, the written notice was put in her hands, which would not have been clearer to her—with her knowledge of the first mortgage and the parties to it—if it had expressly stated that it was in substitution of the first mortgage.

Other circumstances, also, make this probable, and show the good faith of Joseph Kissam. When the new mortgage was given, the price paid by third parties for other lots on the farm, was an average of $632,50 per lot : 42 lots were included in the new mortgage, which at that price would be worth $26,565. The Kissams were then in good credit, and it was in the beginning of the year 1836, when all, with few exceptions, were confident of a continued rise in property ; a confidence that was not shaken until more than a year after ; and when, as Mr. Bleecker shows, it was a frequent thing to allow 75 per cent to remain on mortgage. Those who recollect that period, will say he might have expressed himself even more strongly. Under these circumstances it was nothing surprising for Joseph Kissam to substitute a security on only part of the mortgaged premises, and for Mrs. Stuart to accept it.

Subsequent occurrences also confirm this knowledge and assent on the part of Mrs. Stuart. Although her estate was held in trust for her, it was not from any want of affection or confidence in her husband : she showed both, by appointing all this property to him in case he survived her ; and her confidence, by allowing him to act as her agent in collecting her interest. It is a fair presumption of fact, therefore, that in the intimacy and confidence existing between them, the husband actually communicated to his wife all that he knew about her estate. He gave receipts, from time to time, to Joseph Kissam, for moneys paid on account of interest, and then, afterwards, took up these receipts and gave more general receipts, showing the result of the account. Thus on the 25th of April, 1838, he took up seventeen

receipts which he had before given, and gave one general receipt, showing this fact, and that he had received all the interest due to the 1st of May following, and $90,41 and $150 on account of the interest to fall due on the 1st of November following. This receipt states that it is for interest on the bond of *Samuel* Kissam for $20,000.    Another receipt was given, May 2, 1840, showing a balance due to Mrs. Stuart, of $515,01; it also is expressed to be for "interest on the bond of *Samuel* Kissam." Another was given in May, 1841, showing a balance due Mrs. Stuart of $617,81, and that receipts were given up for $1115; it also is "for interest on the bond of Samuel Kissam." Another receipt was given on the first of May, 1842, showing a balance of $719,98 due to Mrs. Stuart; and that one or more receipts were given up for $1117,80; and it is "for interest on the bond of Samuel Kissam."

It would be the duty of Mr. Stuart, and whether his duty or not, it would be natural for him, on taking up the old receipts, to exhibit them to his wife; and they, if in the form of all the other receipts, would again notify her that Samuel Kissam, and not the doctor, was her bondsman.    As a faithful agent, Robert Stuart would do this; and as a woman careful of her own property, to preserve it from the control or debts of her husband, Mrs. Stuart would require it.    If, as intimated, Mr. Stuart was unfit to attend to business, it is more likely that Mrs. Stuart would watch over his doings, and keep herself acquainted with them.    She would then know, from Mr. Stuart's communications as to the receipts which he had given, what was the security which she held.

Mrs. Stuart allowed matters to remain thus until August, 1842—a period of more than six years; and did not commence any proceedings until December, 1842; and in the mean time innocent parties had purchased part of the property, not included in the second mortgage, and another had taken part as security for an antecedent debt; and this is probably not protected, if Mrs. Stuart can establish that the last mortgage was never assented to by her, although it may be that he might

have obtained other security, if Mrs. Stuart had sooner started her objections.

Although good faith must be strictly enforced against a trustee, and he may not be allowed to deal with the trust property to his own benefit; yet here there was no gain intended to be made by Joseph Kissam. So far as appears, the security would have been deemed sufficient at that time, and it was accepted by Mrs. Stuart, who was competent to judge of its value. The bill is not framed to affect Joseph Kissam merely as trustee, but on the basis of the original mortgage being still in force, and then against Joseph Kissam and others as representatives of the mortgagor; and the decree enforces this view of the bill.

The complainant alledges that she and her husband were ignorant of the contents of the new mortgage, until August, 1842; that Isaac A. Johnson, Esq. called on her about the time of the date of the second declaration of trust, January, 1836, and inquired if she wished to leave her property to her husband; that she answered affirmatively; that he then presented a paper for her signature, saying the object was to secure the property to Mr. Stuart, which she with some hesitation, but relying on Mr. Johnson's statements, signed. That he shortly afterwards returned it to her, with another paper attached, which had been annexed after she had signed the first; and that she relying on Mr. Johnson, (whose integrity she does not mean to impeach,) deposited the two in a trunk without ever reading or examining them, and that they remained undisturbed in the trunk until August, 1842. She says the first declaration of trust was delivered to her after it was executed, by delivery, as she believes, to Isaac A. Johnson, who was the counsel employed by Mr. Cotton, and *acting on her behalf on the occasion*, but that she never had actual possession of it.

Mr Johnson was the subscribing witness to that paper; he was examined by the complainant, and he proves that that paper was executed and delivered by Joseph Kissam in his presence. Here the complainant chose to stop. The proof by a subscribing witness, that a paper was executed and delivered in his

presence, is proof, (not that it was delivered to him,) but to the person for whose benefit it was intended. The proof therefore, is, that the first declaration was delivered to Mrs. Stuart; and as it was afterwards in possession of Mr. Kissam, and another in possession of Mrs. Stuart, she must have given up the first and taken the second.

Mr. Johnson, it appears by this statement, was her counsel at the time of the first trust; she does not impeach his conduct, and his character is too high to admit of impeachment; he *acted for her*, in drawing her appointment in nature of a will, about the same time that the second declaration of trust was executed, and, according to her statement, handed her the appointment and the declaration attached together. It is against all probability, that so careful and honorable a lawyer would have allowed her to execute either paper, without understanding both; and, with the other evidence in the case, the fair inference is, that after six years she had forgotten what the facts of the case were. This conclusion must be drawn, even if the doubtful position assumed by the complainant were to some extent sustained; that, if the defendants rely on the bill to show the substitution, and the bill alledges that the substitution was made in ignorance of the contents of the paper, the defendant must take the latter part of the allegation, or none. If such a rule exist at all, it must be with this limitation, that the allegations favorable to the complainant are not rendered improbable by the other facts, and the evidence in the case; and it probably never was extended to matters which the complainant states in her bill by way of reply to a defense that may be set up, and in anticipation of such defense; that is, more properly, an admission of the defense, and the pleading of new matter in bar of it; in such case the plaintiff must prove the new matter, as the defendant also would be compelled to do, even in a sworn answer, when he introduces new matter. (*See* 4 *Paige*, 507.) Here the satisfaction of the first mortgage, which was produced in evidence, is *prima facie* proof of its discharge; and the whole case of the plaintiff depends on

her establishing, that the second mortgage was not substituted with her assent.

In this view of the case, so much of the decree as directs a sale of any, but the forty-two lots last mortgaged, and an account of the estate of Daniel W. Kissam, jr., and of the personal assets which came to the hands of any of the parties to this suit as legatees and next of kin, and of the real estate which came to said parties as devisees, with the other parts of the decree connected with those inquiries, should be reversed with the costs of appeal. A mortgage in favor of William Onderdonk was sustained, as he was a bona fide purchaser for a new and valuable consideration without notice. He appeals probably, because he considers costs should have been given to him. They should have been given to him, as they were to two others against whom the bill was dismissed.

The decree directs an account of the personal and real estate of Dr. Kissam, and of how much of either was received by any party to the suit, as legatee, next of kin, or devisee; and also, an account of all the creditors of Dr. Kissam, who are to be brought in by advertisement; and further directions are reserved, until the coming in of that report.

The object of this reference, is, to subject the share of Dr. Kissam's estate received by any legatee, or devisee, to the payment of any deficiency on the sale of the mortgaged premises.

It may be, that it would be very convenient in this one suit to settle all those various rights. But the legislature, in passing the revised statutes, adopted a different rule, which still remains unrepealed.

Actions may be brought against legatees by a creditor; but then he must show that no assets were delivered by the executor to the next of kin, or that the value of such assets has been recovered by some other creditor, or that they are not sufficient to satisfy his demand. (2 *R. S.* 452, § 27.) No such allegation is made, but it is declared by the plaintiff, that the testator left $30,000 over *all* his debts and liabilities; and it is proved that his personal estate was inventoried at $50,000. The personal estate was the primary fund for the payment of

any deficiency, and the executors, as such, were the parties through whom that should be reached. Heirs also, may be made liable for the debt of their ancestor, but not unless it appears that the personal assets were not sufficient to pay the same, or that after due proceedings *before the surrogate, and at law,* the creditor has been unable to collect such debts from the executors, or from his next of kin, or legatees. (2 *R. S.* 452, § 33.) Thus a suit at law against the prior parties is an essential preliminary to a right to sue the heirs. The heirs are to be sued jointly in equity. (*Id.* 454, § 42.)

Devisees may also be liable for the debts of the devisor; (*Id.* 452, § 32;) but not unless it appears that the personal assets of the real estate descended, were insufficient to discharge the debt; or that after due proceedings before the surrogate, and at law, the creditor has been unable to recover the debt. (*Id.* 455, § 56.) The reverse appears here, for the personal estate seems to have been sufficient to pay all the debts ; and it is expressly alledged that there has been no accounting before the surrogate.

It makes no difference though the same persons are entitled to the *whole* estate, real and personal.

Bronson, Ch. J., says, in *Mersereau* v. *Ryerss,* (3 *Comst.* 261–3,) " It is said that the defendants are entitled to the whole estate, real and personal, and that it is not important to them out of which fund the debt is paid. But the legislature did not so view the matter. The statute makes no exception ; but requires the creditor in *all cases* to seek satisfaction from the personal property, before he resorts to the real estate in the hands of the heir." He shows, that in a suit of this kind, whether at law or in equity, all the heirs must be joined; (*Stat.* 1837, *p.* 537, § 73 ;) and that the heirs and personal representatives can not be joined in a suit. (3 *Comst.* 262.) And so are the decisions in 11 *Paige,* 515, ( *Wambaugh* v. *Gates, affirmed Nov.* 1847.) 9 *Id.* 45, 46, (*Schermerhorn* v. *Barhydt,*) and *Butts* v. *Genung,* (5 *Id.* 259.) In 9 *Paige,* 46, the chancellor says : " it is no longer allowable for a creditor to file his bill against the personal representatives, and the heirs and

devisees of the decedent jointly, *either* for the recovery of his own debt, or for the benefit of all other creditors who might think proper to come in under the decree." Yet here the executors are made parties, as such, and a decree sought against them in that character; and at the same time, the heirs and devisees are also made parties, jointly with the executors, and relief sought against them in that character; and although the bill is framed for the benefit of the plaintiff alone, and not for other creditors, the decree seeks to bring in all the creditors of the estate, and settle all their rights in this suit. That part of the decree is unauthorized by the frame of the bill, and the misjoinder is also objectionable.

In 6 *Hill*, 350, (*Gere* v. *Clarke*,) it was also held that the same person could not be sued in one count, as heir and personal representative.

Neither do the provisions in the will of Dr. Kissam make a difference in this case, for his directions are express, that his executors pay *all* his just debts and funeral charges out of his personal estate. This would include the bond debt; though secured by a mortgage, it was one of his just debts, and so was expressly to be paid out of his personal estate; and it was only if that proved insufficient, that the executors were authorized to sell so much of the real estate as would be sufficient to make up the deficiencies. The will, therefore, prevents the 58*th section* of 2 *R. S.* 455, 456, from applying to this case.

Even, therefore, if the bond of Dr. Kissam were not satisfied, the decree should not have gone further than to order a reference, as against the executors, in case of any deficiency on the sale of the mortgaged premises.

It is not necessary to inquire whether a different rule would apply, if it had been shown that there was a fraudulent combination between Joseph Kissam, Timothy T. Kissam, and Samuel Kissam, to cancel the first mortgage for their benefit. There is no proof of actual fraud, and it ought not to be gratuitously inferred.

Let the decree be reversed with costs of appeal and of the court below, except so far as it allows a sale of the forty-

two lots, and the payment of the proceeds to Mrs. Stuart, at least so far as the appellants are concerned; all other matters can be settled on settling the form of the decree.

[NEW-YORK GENERAL TERM, June 14, 1851. *Edmonds, Edwards* and *Mitchell,* Justices.]